**KIRKLAND & ELLIS, et al., Plaintiffs,**

v.

**Jose Maria RUIZ–MATEOS, et al., Defendants.**

**Civil Action No. 92–829–LFO.**

United States District Court, District of Columbia.

April 25, 1996.

Kirkland & Ellis by James Basile, Charles Hunter Wiggins, Washington, D.C., for Plaintiffs.

Andres & Kurth, L.L.P. by Douglas V. Rigler, Robert Lamkin, Washington, D.C., for defendant Rivero.

## MEMORANDUM

### I.

### A.

OBERDORFER, District Judge.

A bench trial having taken place on March 11 to 13, 1996, there is now before the Court for decision on the merits the claim of Kirkland & Ellis, partners in a Chicago law firm with offices in Washington, D.C., for unpaid fees and disbursements billed to defendant Jose Maria Ruiz–Mateos, through his nephew and United States representative, defendant Alfonso Baron Rivero. Ruiz–Mateos is the head of a Spanish family which owned Rumasa, a holding company with 700 subsidiaries. One of those subsidiaries, Williams & Humbert Ltd., an English company, produced and distributed Dry Sack Sherry world-wide. In 1976, anticipating expropriation by Spain, Ruiz–Mateos purported to transfer the Dry Sack trademarks, including the United States trademark, to another company. As anticipated, in 1983 Spain expropriated the Ruiz–Mateos family interest in Rumasa and hence, in Williams & Humbert. In time, to quiet its title to the Dry Sack trademark, Williams & Humbert sued the transferee company in England and in this Court. Williams & Humbert named Ruiz–Mateos and his family as defendants in the English suit, but conspicuously failed to name them in the complaint filed here. While the action here was stayed, Ruiz–Mateos' then representative in the United States, Alfonso Lacave, at the suggestion of other counsel, consulted Kirkland about potential representation of Ruiz–Mateos' interests in the U.S. litigation. Pls.' Ex. 3.

In a letter dated April 29, 1986, James M. Amend, a Kirkland partner, advised Lacave that while Kirkland's "background on the matter is not deep, it had some thoughts." Pls.' Ex. 3. Amend pointed out that unless Ruiz–Mateos intervened in the U.S. action, Williams & Humbert would "continue reaping the benefits" of the U.S. sales of Dry Sack without pressing the pending litigation. Williams & Humbert, having prevailed in England, could use the English judgment to perfect a title to the U.S. trademark administratively in the U.S. Patent and Trademark Office. Amend advised that the Ruiz–Mateos family could intervene in the case in this Court and counterclaim on the theory that Spain's expropriation without compensation of the U.S. trademark, as distinguished from Ruiz–Mateos' other interests in Rumasa, violated the Due Process Clause of our Constitution. Amend cautioned that "[t]he case will be a difficult one, because Spain is considered to be a friendly country" so that a U.S. judge "might be reluctant to rule that Spain had taken action which violates the rules of behavior prescribed by the United States." Nevertheless, Amend opined that "the equities appear to be quite favorable to the Ruiz–Mateos family if we are successful in separating the Williams & Humbert expropriation from the taking of the balance of Rumasa." *Id.* Amend again cautioned that "[w]hile success cannot be guaranteed, and an uphill battle is before us, default will result in abandonment of all U.S. rights in the marks" which rights, Amend was advised, "have significant value." *Id.* Amend's letter left it to Ruiz–Mateos and his family to "decide whether the costs of litigation … are warranted in an attempt to recapture these assets, as against the risk that these costs will be wasted." Estimating that "[t]he time to trial from the date the case is reopened should be from one to two years," Amend further cautioned that "[i]t is difficult for us to be more specific at this time.… [and] also difficult to estimate the cost to be incurred in such a litigation, because it can vary greatly depending upon the tenacity and ability of the opponent." Given these caveats, Amend offered as "guidelines" an estimate that "it will cost approximately $20,000 to $40,000 to reopen the case, undertake our own fact investigation … research and prepare an answer and counterclaim" over the next 30 to 60 days. Amend estimated that "the expense of litigating through a full trial

and appeals could reach the $300,000–$500,-000 range," with a $50,000 retainer or security deposit in advance. He expected an average hourly rate to be $125 for the lawyers (partners and associates) and paralegals involved. Finally, Amend stated, Kirkland "would send monthly statements for its fees and expenses, which it would expect to be paid within 30 days." There was no suggestion in the correspondence that Kirkland's fees would be contingent on success.

Despite the fact that, in the interim, two English courts had recently ruled against him, Ruiz–Mateos, through his representative, authorized Kirkland to move to intervene in the U.S. suit. Kirkland filed the appropriate pleadings on October 27, 1986. Judge June Green denied the motion, and Kirkland appealed. On February 23, 1988, the Court of Appeals reversed. *Williams & Humbert Ltd. v. W. & H. Trade Marks (Jersey) Ltd.*, 840 F.2d 72 (D.C.Cir.1988). After extensive pretrial preparation in the United States and Spain, including retention of Gordon Smith (d/b/a Associated Valuation Technologies, Inc.), the case went to trial on October 9 and 10, 1990. On January 29, 1991, Judge Green ruled against Ruiz–Mateos on the merits.

Citing Ruiz–Mateos' failure to pay the monthly bills rendered by plaintiffs after April 1990, plaintiffs filed a protective notice of appeal on February 26, 1991 and withdrew from further representation in a letter dated February 27, 1991. *See* Def.'s Ex. 143. Judge Green granted plaintiffs' motion to withdraw on March 28, 1991. On April 6, 1992, plaintiffs filed this suit against Ruiz–Mateos and Rivero for unpaid fees and disbursements. An expert witness, Gordon Smith, retained for the Dry Sack trial and who remains unpaid, has joined in this action as against Ruiz–Mateos only. Ruiz–Mateos has neither moved, answered, nor made a special appearance to quash attempted service or to challenge this Court's jurisdiction over him. The Clerk has entered a default against Ruiz–Mateos. Rivero first answered *pro se,* but has since retained counsel.

From the outset of Ruiz–Mateos' engagement of Kirkland and as a part of the attorney-client arrangement, Kirkland sent its bills for services to Ruiz–Mateos' designated U.S. representative, and his predecessor representatives, each of whom in turn served as the channel for "all billing matters, strategy, all working relationships" with Ruiz–Mateos. March 12, 1996 Tr. at 32–33. After January 1989, Rivero succeeded his predecessors as Ruiz–Mateos' U.S. representative. Rivero is Ruiz–Mateos' nephew and had managed the Ruiz–Mateos' family relationship with lawyers in many countries since at least the mid–1980's. Rivero directed Kirkland to send all inquiries about the litigation including, particularly, billing, directly to him at his address in Madrid, an address different from that of Ruiz–Mateos.

Throughout the engagement, Kirkland and Ruiz–Mateos' representatives understood that Ruiz–Mateos would make the ultimate decisions on the payment of bills. Walsh, the partner who "handled the day-to-day operations for the case" and who was "basically the contact for billing," testified that it was Kirkland's "understanding [ ] that [Ruiz–Mateos] would ultimately make the decision [with respect to payment of bills]." March 12, 1996 Tr. at 31–32, 57. As lead counsel in the Dry Sack case, Amend testified that he "was told by Mr. Rivero that on the subject of payment of bills, that this needed Mr. Ruiz–Mateos' authorization and approval." March 11, 1996 Tr. at 102. Rivero stated that when he received Kirkland's bill, "I will review the bill, and I will present the bill, if it was correct in my opinion to be paid, to Mr. Ruiz–Mateos." March 13, 1996 Tr. at 16.

According to Amend, the billing practice from 1986 and 1989 was "bills within 30 [days], payment within 30 [days], but sometimes, there was a week or two slippage on either the billing or the payment." March 11, 1996 Tr. at 39. However, Rivero often received Kirkland's bills later than 30 days after the close of the month and would "normally" be presented with more than one month's bill at a time. March 13, 1996 Tr. at 19. Kirkland's bill for May 1990 services is dated August 15. *See* Def.'s Exs. 1, 2. The June bill is dated September 7, 1990; the July bill, September 28, 1990; the August bill, October 20, 1990; and the September

and October bills, November 28, 1990. *See* Def.'s Exs. 1–5, 7–8, 10.

Payments were similarly irregular. Amend testified that "the family had, on occasion, been somewhat slow paying, but by that I mean only 30 days at most." March 11, 1996 Tr. at 54. However, the evidence shows that Ruiz–Mateos had a history, which began at least as early as February 1987, of paying his bills *much* later than "30 days at most." On February 4, 1987, Walsh wrote Lacave, the first of Ruiz–Mateos' representatives, that Walsh was "unable to confirm with our account department that Mr. Ruiz–Mateos made payment for the September and October [1986] bills in late-December." Walsh concluded his letter, "we look forward to prompt payment of the November and December [1986] bills." Def.'s Ex. 127. On September 9, 1988, Walsh wrote to Peralta, the second of Ruiz–Mateos' representatives, that "[i]t has been two months since we last received a payment for our services rendered on behalf of Jose Maria Ruiz–Mateos. We would appreciate payment of the outstanding bills." Def.'s Ex. 128. On June 6, 1990, Walsh telephoned Rivero about the January and February 1990 bills, which totaled $41,944.96, to remind him that as of June 6, "only a partial payment was made of $27,548.83" on the January and February bills. *See* Def.'s Ex. 130 (Kirkland's record of June 6, 1990 telephone call). On the March and April 1990 bills, Rivero questioned items pertaining to, *inter alia*, billing time for travel and the unnecessary and excessive use of "legal assistants, project assistants and clerical aides." *See* Def.'s Ex. 131. On June 26, 1990, Walsh wrote a memorandum to Kirkland's Billings and Collections Committee detailing Rivero's many questions and requesting authorization to reduce the March and April bills. *See id.* The parties resolved these disputes on July 5, 1990, when Kirkland reduced the disputed March and April bills by 22%. *See id.;* Pls.' Ex. 10. Ruiz–Mateos paid the April 1990 bill in August 1990. March 13, 1996 Tr. at 32–33. Rivero did not send his comments about a reduction proposal on the May and June 1990 bills to Walsh until October 22, 1990. Def.'s Ex. 102.

The simmering fee difficulties came to a head when Ruiz–Mateos and Rivero arrived in Washington a day or two before trial and met with Amend and Walsh. Amend asked Rivero whether there was a problem; "we have yet to receive a penny [since August 1990] . . . and we are about to incur a large amount of additional fees and disbursements on your behalf." March 11, 1996 Tr. at 56–57. According to Amend, Rivero replied:

> there was not a problem. [Rivero] indicated to me that the reason that we had not been paid was that Mr. Ruiz–Mateos had been traveling throughout Europe on other business and simply had not gotten back to Madrid and had the opportunity to sit down and turn his mind to this particular matter, but that there was no problem. . . . *[Rivero] assured me that the bills would be approved and paid and that there was absolutely no problem going forward that fees and expense incurred from that point on would also be paid.*

*Id.* at 57 (emphasis added). Furthermore, according to Amend, during this meeting Rivero gave no indication that there was any problem in terms of the ability of the Ruiz–Mateos family to pay Kirkland's bills and stated that he "was pleased with the quality of service that he received." *Id.* at 59. Walsh corroborated: Rivero "assured us that he would get the bills paid." March 12, 1996 Tr. at 49. "He [Rivero] said that we'd always been paid in the past, there was no reason for us to be worried about payment now, and that it would be taken care of." *Id.* at 47.

According to Kirkland's witnesses, in reliance on Rivero's representations, they went forward with the trial and post-trial briefing, incurring in the process additional charges for services totaling $120,935.00, and paid out-of-pocket disbursements on behalf of Ruiz–Mateos totaling $61,862.29. *See* Pls.' Exs. 30, 32, 36. If they had not received and relied on Rivero's assurances on behalf of Ruiz–Mateos, they would have had available several measures to protect themselves. They could and would have requested a substantial retainer from Ruiz–Mateos before doing further work or making further disbursements; asked Judge Green to continue

the case until they received the retainers; and, ultimately, sought to withdraw.

Rivero's testimony about the October 6, 1990 meeting differed materially from that of Amend and Walsh. As a preliminary matter, according to Rivero, this conversation occurred on October 8, not October 6. Rivero stated that on October 6, he and Ruiz–Mateos arrived in the United States in the afternoon after a flight from Spain and met with Amend and Walsh for dinner. March 13, 1996 Tr. at 20. On October 8, the day before trial, Rivero and Ruiz–Mateos met with Amend and Walsh. According to Rivero, "Mr. Amend and Mr. Walsh called me in one side of the conference room to discuss some bills with me." They

> presented to me two bills, I think it was the May bill and the June bill. And they delivered to me the July bill [which] was prepared on the first of October I remember. And somewhere they asked me what—what happened with these bills, and I think I have to review these bills, and I have to discuss this with Mr. Ruiz–Mateos, and after this discussion with Mr. Ruiz–Mateos, if they were correct, they will— the bills will be *probably* paid.

*Id.* at 22 (emphasis added). This conversation lasted "ten or fifteen minutes." *Id.* at 21. Rivero testified that he was able to make this representation "based on my experience. Because Mr. Ruiz–Mateos was paying the bills since 1986, and we were in 1990, this is four or five years later, and during this time, Mr. Ruiz–Mateos paid twelve times—twelve months, about fifty bills to Kirkland and Ellis." *Id.* at 52. Rivero further stated, "I am sure that I didn't give any promise at that time to pay the bills. I am sure of this fact." *Id.* at 23.

It is undisputed Rivero conducted no inquiry into whether Ruiz–Mateos intended to pay the May and June 1990 bills. *Id.* Although Ruiz–Mateos was in the conference room at the time of Rivero's conversation with Walsh and Amend, neither Rivero nor Walsh and Amend attempted to speak to Ruiz–Mateos about the past due bills or payment for the forthcoming trial and its aftermath. *Id.* at 21.

After the trial and before Judge Green decided the case, Ruiz–Mateos had not still not paid the outstanding bills. On November 16, Amend met with Rivero in Miami and presented to him a list of outstanding bills. Again, according to Amend, Rivero reassured him "that Mr. Ruiz–Mateos intended to pay additional legal fees," and that as soon as Ruiz–Mateos returned to Madrid, payment would be processed. March 11, 1996 Tr. at 62. Subsequent to November 16, 1990, Kirkland incurred $30,044.16 in disbursements and $8,079.50 in fees. Thereafter, in early December 1990, while Judge Green still had the case under advisement, the Ruiz–Mateos' family made an unearmarked lump sum payment of $50,000.

Judge Green filed the decision adverse to Ruiz–Mateos on January 29, 1991. On February 19, 1991, Rivero wrote to Kirkland that "it is impossible for him [Ruiz–Mateos] to pay now the pending Kirkland and Ellis bills." Pl.'s Ex. 42. Instead, Rivero stated that Ruiz–Mateos would pay Kirkland only if it successfully presented an appeal from Judge Green's adverse ruling. As indicated, Kirkland filed a protective appeal and withdrew and, on April 6, 1992, filed this suit for the unpaid balance of fees and disbursements totaling $569,252.04.

**B.**

In the summer of 1990, on Kirkland's advice, Rivero retained Gordon Smith of plaintiff Associated Valuation Technologies to provide expert testimony regarding the fair market value of the U.S. rights to the Dry Sack trademark with the understanding that Associated would submit, and Ruiz–Mateos would pay, monthly bills for fees and expenses. March 12, 1996 Tr. at 84, 95–96. Prior to the October 1990 trial, Smith submitted to Rivero two months' invoices for fees and disbursements. In an October 2, 1990 letter, Smith advised Rivero that "we have not received payment for the earlier invoices," and that those earlier invoices and the current invoices needed to be paid *"prior to my appearance [at trial] next week."* Pl.'s Ex. 20. Smith and Rivero met each other for the first time in early October on the eve of trial. When Smith asked Rivero about the

outstanding bills, Rivero stated that "the bills had been approved ... they were being processed and merely paperwork standing in the way of receiving the payments." March 12, 1996 Tr. at 93–94.[1] Smith thereupon testified at trial before Judge Green. Smith was never paid.

Before Rivero made his October and November representations to Kirkland and while Rivero was serving as Ruiz–Mateos' representative with lawyers, Ruiz–Mateos had failed to pay bills for services rendered by two other lawyers in circumstances resembling his handling of the outstanding Kirkland bills. At the times in October and mid-November that Rivero met with Kirkland's partners, he also knew that he had represented to Smith that the "amount was on its way" when it was not.

On the basis of all of the evidence, I find that it is more likely than not likely that on or about October 6, Rivero assured Amend and Walsh that Ruiz–Mateos intended to pay Kirkland's outstanding bills without inquiry of Ruiz–Mateos who was easily accessible. I base this finding on the following: Amend's and Walsh's testimonies are consistent with each other, whereas throughout the litigation, Rivero has taken differing and conflicting stances on whether or not he represented to Kirkland that Ruiz–Mateos intended to pay Kirkland's bills. *Compare* Pl.'s Ex. 51 (Rivero's Sept. 28, 1992 *pro se* motion) at ¶¶ 16, 18 (stating that he did make such representations) *with id.* at ¶ 20 *and* March 13, 1996 Tr. at 23 (denying he made such representations). Also the Amend/Walsh testimonies that Rivero assured Kirkland that Ruiz–Mateos intended to pay Kirkland's bills are consistent with the fact that Kirkland proceeded to trial. It is undisputed that Rivero failed to obtain Ruiz–Mateos' confirmation of Rivero's October representations to Kirkland and Smith. It is more likely than not likely that Kirkland would not have taken the case to trial as scheduled, thereby incurring significant expenses and billing significant legal fees, without an assurance from Rivero that payment would be forthcoming. Nor would Smith have testified, but for Rivero's assurances about Ruiz–Mateos' intention to pay his bills.

## II.

After extensive pretrial pleadings, discovery, a three-day trial, and the submission of very helpful proposed findings and conclusions, the case is ready for decision.

As more fully set out below, I find that:

1. Ruiz–Mateos has been served, has failed to answer or move, and has been the subject of a default entered by the Clerk. Final judgment on the default should be entered against Ruiz–Mateos in the amount of $569,252.04.[2]

2. Plaintiffs have established by a preponderance, but not by clear and convincing evidence, that

(a) Rivero represented to plaintiffs on the eve of trial and on November 16, 1990, that Ruiz–Mateos intended, and was able, to pay plaintiffs' outstanding and future bills for services subject to adjustment for particulars, when Rivero knew, or should have known, the representations to be false or sufficiently dubious to require Ruiz–Mateos' confirmation.

(b) Rivero failed to exercise the care due to plaintiffs to determine the accuracy of his representation, on which he knew, or should have known, they would rely.

(c) Plaintiffs relied upon these representations.

An objective interpretation of the documentary evidence, the conflicting accounts of what the parties said to each other from time

---

1. Two letters confirm Smith's recounting that Rivero stated to him that the bills had been approved. First, a letter from Rivero to Zoilo Ruiz–Mateos, son of defendant Ruiz–Mateos, states that "I think we should send him [Smith] immediately, at least the first 2 months.... I have already told them that this amount was on its way." Pl.'s Ex. 1 (translation). Second, a January 30, 1991 letter from Smith to Rivero states that "[y]ou informed me yourself that the invoices were in the process of being paid." Pl.'s Ex. 38 (translation). Smith has not been paid any of his bills.

2. The unpaid balance of Kirkland's bills is $569.252.04, $125,855.09 of which represents its out-of-pocket disbursements on behalf of Ruiz–Mateos.

to time, the defendants' course of dealing about fees during Rivero's relationship with Kirkland *and* Smith, the evidence of defendants' tactics in fee matters with other attorneys, and their tactics before this Court, yield the following findings:

1. The Ruiz–Mateos family retained plaintiffs after a meeting with, and on the recommendation of, other counsel for the family.

2. The parties' original engagement was offered by plaintiffs' proposal of April 1986 and became binding after defendants' acceptance of plaintiffs' subsequent rendering of services and incurring of substantial out-of-pocket disbursements. Defendants compensated Kirkland for a sufficient period of time to establish a ratifying course of dealing.

3. The plaintiffs' proposal and their earlier course of dealings contemplated that plaintiffs would submit, and Ruiz–Mateos would pay, within 30 days, monthly bills for services and out-of-pocket disbursements submitted by plaintiffs, subject to delay and adjustment in an amount agreed upon from time to time, after good faith negotiation between plaintiffs and Rivero, on behalf of Ruiz–Mateos, about particulars, such as arguably excessive staffing, unnecessary travel, and other specific items of fees and disbursements.

4. Rivero has been in charge of international litigation matters for the Ruiz–Mateos family since the mid 1980's, and has served as their agent in the family's relationships with lawyers in England, Holland, Germany, Italy, Switzerland and Spain. March 13, 1996 Tr. at 34–37. Ruiz–Mateos vested in Rivero authority and responsibility to be the exclusive buffer and channel of communication between the plaintiffs and Ruiz–Mateos with respect to litigation strategy and administration of the fee agreement, and held him out to plaintiffs as such, subject always to the final authority of Ruiz–Mateos, exercises of which were to be, and were, communicated to plaintiffs by Rivero.

5. Plaintiffs accepted and faithfully abided by these conditions in the attorney-client relationship. Other than preparing Ruiz–Mateos as a witness on the eve of trial, plaintiffs' only contact with him was social. Plaintiffs' attempted failure to communicate directly with Ruiz–Mateos at or after their October 6 fee discussion with Rivero corroborates plaintiffs' version of Rivero's representation to them about his role and Ruiz–Mateos' ultimate authority and responsibility. It is reasonable to infer that if Rivero had equivocated by saying "probably," as he recently testified that he did, plaintiffs would have seized the opportunity to appeal to and confront Ruiz–Mateos before they asked for a continuance or otherwise raised their fee problem with Judge Green on the eve of trial.

6. It is more likely than not likely that, on the eve of trial, Ruiz–Mateos believed that he had already paid too much for plaintiffs' services, and it is reasonable to infer that he had formed a decision not to pay their outstanding or future bills unless he won the case in which plaintiffs were representing him. Previously he had stopped paying other lawyers, who had agreed to bill him periodically, as soon as their services were complete, but before he had paid outstanding bills. He caused, or permitted, Rivero to falsely represent to plaintiff Smith that, in effect, "the check is in the mail," *see* Pls.' Ex. 1, when in fact, Ruiz–Mateos made no payment to Smith then or thereafter for his services and expenses as an expert witness.[3] Ruiz–Mateos caused, or permitted, Rivero to write to plaintiffs that "it is impossible to him [Ruiz–Mateos] to pay now the pending Kirkland & Ellis bills," Pls.' Ex. 42, and to exercise the power of the party who held, and could withhold, payment to unilaterally change a non-contingent fee agreement into a contingent one: Ruiz–Mateos would pay outstanding and future bills only if Kirkland successfully prosecuted an appeal from Judge Green's adverse ruling.

7. It is more likely than not likely that the undesignated $50,000 payment was de-

---

**3.** Plaintiff Smith has billed defendants $25,-557.83 for his services and disbursements. *See*

Amended Compl. ¶ 39.

signed to deflect plaintiffs' possible withdrawal from the case or appealing to the Court while the case was under advisement.

8. Finally, Ruiz–Mateos' behavior toward this Court tends to confirm that Rivero knew or should have known Ruiz–Mateos to be a person capable of, and practiced at, avoidance, if not evasion, of selected financial and legal obligations, and that therefore, Rivero should have obtained Ruiz–Mateos' reassurance before making representations to plaintiffs about Ruiz–Mateos' resources and intentions. The complaint in this case was served by mail addressed to each of the defendants.[4] Whatever formal defect there may be in the service of this complaint upon Ruiz–Mateos, it would be incredible if he did not know that he was personally a party to this suit. Yet, he has neither answered, moved, nor made a special appearance to quash attempted service or contest this Court's jurisdiction. Furthermore, he has stood mute while the Clerk of this Court entered a default. No judgment has been entered against him, awaiting resolution of the claim against his co-defendant. It will be now.

### III.

■ It is black letter law that a claimant establishes a claim of negligent misrepresentation by a showing that (1) the defendant negligently communicated false information; (2) the defendant anticipated or should have anticipated that the plaintiff would likely be disadvantaged by action taken or foregone in reliance upon the misrepresentation; and (3) plaintiff reasonably relied upon the false information to his detriment. *See, e.g., Hall v. Ford Enterprises, Ltd.,* 445 A.2d 610, 612 (D.C.1982).

■ The totality of all these circumstances and the pattern discernible from them, together with the record of Rivero's many years of service as Ruiz–Mateos' trusted nephew-agent for litigation, confirms plaintiffs' contention that:

1. On October 6, 1990, Rivero represented to plaintiffs that Ruiz–Mateos intended, and was able, to pay bills for past and future services, subject only to adjustments for particulars.

2. Plaintiffs relied on that representation to perform additional services, to incur additional out-of-pocket disbursements in furtherance of their services to Ruiz–Mateos, and to refrain from petitioning Judge Green for relief from further obligation to the client, or enforcement of the client' obligation to them.

3. In October Rivero knew, should have known, that Ruiz–Mateos did not intend to pay Kirkland's bills unless he won the case. If he was uncertain, he should have confirmed the representation with Ruiz–Mateos who was nearby. The relationship and course of dealing were such that plaintiffs had no right or duty to inquire directly of Ruiz–Mateos, even though he were nearby, unless Rivero's response to their October 6 inquiry had been negative or equivocal, which it was not.

The foregoing facts lead to the conclusions that Rivero held himself out to plaintiffs as, and was in fact, the spokesman for Ruiz–Mateos in respect to the attorney-client relationship between the plaintiffs and their client. He "is not relieved from liability [for a tort] by the fact that he acted at the command of a principal or on account of the principal." *Camacho v. 1440 Rhode Island Avenue Corp.,* 620 A.2d 242, 246 (D.C.1993). Plaintiffs were entitled to rely on Rivero's October and November 16 representations that Ruiz–Mateos was able to pay their bills and intended to do so. In reasonable reliance on those representations, plaintiffs incurred out-of-pocket disbursements and proceeded to trial of the pending litigation and continued to make out-of-pocket disbursements without seeking a continuance or intervention of Judge Green, or otherwise taking action to protect themselves against a

---

**4.** Rivero answered "pro se," representing that he lacked means with which to hire a lawyer. Yet, when the case came to issue at the summary judgment stage, counsel miraculously appeared and has most ably presented Rivero. Ruiz–Mat-

default. It is more likely than not likely[5] that at the time Rivero made those representations Ruiz–Mateos intended *not* to pay plaintiffs' outstanding and future bills, adjusted for particulars, unless Judge Green decided the then pending case in his favor, as Rivero ultimately advised plaintiffs in February, 1991 after Judge Green's unfavorable decision. It is also more likely than not likely that Rivero either knew that was Ruiz–Mateos' intention and neglected to advise plaintiffs of it, or he did not knew and failed to ascertain Ruiz–Mateos' intentions before he made the erroneous representation to plaintiffs on which they relied to their detriment as he, Rivero, expected them to do.

It is well established, generally and in the District of Columbia, that "[o]ne engaged in supplying information has a duty to exercise reasonable care.... Where information is supplied directly to a third party (or indirectly for the benefit of a specific third party), then the same duty of reasonable care exists, notwithstanding a lack of privity." *Security National Bank v. Lish,* 311 A.2d 833 (D.C. 1973); *see also Remeikis v. Boss & Phelps, Inc.,* 419 A.2d 986, 990–91 (D.C.1980); *Glanzer v. Shepard,* 233 N.Y. 236, 135 N.E. 275 (1922). Rivero, and through him, Ruiz–Mateos, violated that duty.

For these reasons, an accompanying Order will direct the entry of judgments (1) for the Kirkland plaintiffs against defendant Ruiz–Mateos in the amount of $569,252.04, plus pre-judgment interest from February 19, 1991[6]; (2) for Associated Valuation Technologies, Inc. against Ruiz–Mateos in the amount of $25,557.83, plus prejudgment interest from January 30, 1991[7]; (3) and against Rivero on Count IV of the Amended Complaint in an amount to be determined after further proceedings scheduled in that order.

ORDER

For the reasons stated in the accompanying Memorandum, it is this 25th day of April 1996 hereby

ORDERED: that JUDGMENT should be, and is hereby, entered against defendant Rivero in favor of plaintiffs Kirkland & Ellis, *et al.* on Count IV of the Amended Complaint in an amount to be determined after a hearing which will be held on *May 28, 1996 at 10:00 a.m. in Courtroom 3;* and it is further

ORDERED: that plaintiffs' renewed motion for entry of default judgment against defendant Ruiz–Mateos should be, and is hereby, GRANTED; and it is further

ORDERED: that plaintiffs' motion for final judgment against defendant Ruiz–Mateos should be, and is hereby, GRANTED; and it is further

ORDERED: that JUDGMENT should be, and is hereby, entered for plaintiff Kirkland & Ellis against defendant Ruiz–Mateos in the principal amount of $569,252.04 plus pre-judgment interest at the rate of 6% per annum from February 19, 1991 to the date of payment; and it is further

ORDERED: that JUDGMENT should be, and is hereby, entered for Associated Valuation Technologies against defendant Ruiz–Mateos in the principal amount of $25,557.83 plus pre-judgment interest at the rate of 6% per annum from January 30, 1991 to the date of payment.

---

eos shares responsibility for Rivero's posturing as an indigent unable to afford counsel.

5. Plaintiffs' evidence of fraud is disputed and circumstantial and is not sufficiently clear and convincing to sustain a finding of that theory.

6. On this date, defendants foreclosed pre-litigation settlement of their obligation to plaintiffs thereby firmly fixing its face amount. *See*

D.C.Code § 15–108 (in an action to recover a liquidated debt, judgment for the plaintiff "shall include interest on the principal debt from the time when it was due and payable"); Pls.' Ex. 42.

7. On this date, plaintiff Associated Valuation Technologies sent to Rivero its last invoice. Pls.' Ex. 38 (translation).