**Joseph FERENC, et al., Plaintiffs,**

v.

**WORLD CHILD, INC., et al., Defendants.**

**Civil Action No. 95–2199.**

United States District Court, District of Columbia.

Sept. 19, 1997.

Leslie Scherr, Seymour & Scherr, PLLC, Washington, DC, for Plaintiffs.

Jeffrey Jerome Hines, Eccleston & Wolf, Washington, DC, for Defendants.

Richard Bart Nettler, Pamela M. Deese, Robins, Kaplan, Miller & Ciresi, Washington, DC, for the Frank Foundation Child Assistance International.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

In early November, 1994, plaintiffs Joseph and Julie Ferenc, a New Jersey couple, adopted a three-year-old Russian boy, Alexander Kiruskatski, in Tver, Russia, and brought the child to the United States. Over

the ensuing months it became apparent that Alexander suffers from one or more serious and irreversible congenital neurological and visual disorders. In consequence, the Ferencs brought this action in November, 1995, for "wrongful adoption" against, *inter alia,* defendants World Child, Inc. ("WCI"), a District of Columbia adoption agency through which Alexander's adoption was arranged, and three of its employees who participated in making the arrangements.[1]

Plaintiffs allege that by misrepresenting Alexander to them as essentially healthy, defendants caused them to adopt (and thus to assume parental responsibility for) a child whom they would not have adopted had they been fully informed of his true physical and mental condition. According to plaintiffs, defendants either knew of Alexander's deficits and intentionally concealed them from plaintiffs, or knew little or nothing about them and negligently concealed their ignorance. Plaintiffs also charge defendants with intentionally causing them emotional distress.

The case is presently before the Court on the motion of defendants WCI and its employees for summary judgment, the necessary discovery having been substantially completed. The co-defendant The Frank Foundation has belatedly joined in the motion immediately prior to oral argument.

## I.

The record before the Court establishes that in the spring of 1994 the Ferencs, having previously adopted a Guatemalan boy without complications, decided once again to try a foreign adoption. They became aware of WCI through a news article and inquired of its executive director of the prospects for adopting a Russian child. Told that, in general, the health of Russian adoptees was "very good," the Ferencs entered into a written contract with WCI for its services in early August, which the parties later supplemented in writing in September, 1994, after

WCI had engaged the assistance of co-defendant The Frank Foundation to locate a Russian child available for adoption. (Def.Ex. 1–4.) Both Ferencs signed the contract documents, initialing them on each page, on August 5th and September 28th, respectively.

Also in September, 1994, WCI informed the Ferencs that two Russian children had been identified as available for placement[2] and sent them photographs and a three-page English translation of an abstract of Alexander's medical history, dated July 21, 1994, prepared by the Russian physician (an unserved co-defendant) in charge of the orphanage in Tver. Among other matters the abstract disclosed that Alexander had been born prematurely on June 11, 1991, as the third child of a poor, single mother who died in January, 1994. At birth he weighed 4.73 pounds and currently weighed just under 25 pounds. His head circumference was given as 45.5 cm. or 18.2 inches. He was said to have "convergent strabismus" and flat feet. A neuro-psychiatric entry noted "delay of mental development," and that phrase was repeated as the "diagnosis," attributable (in the doctor's opinion) to "social neglect in the family."

When queried by the Ferencs, WCI officials assured them that the conditions reported appeared to be neither unusual in adoptive children from Russia in their experience, nor uncorrectable. On their own initiative, the Ferencs consulted a general practitioner of their acquaintance in New Jersey to whom they showed both the photo of Alexander and the medical abstract. He refused to offer any opinion on the child's condition and suggested that they ask for further information. WCI informed the Ferencs that it had access to no information about Alexander other than as had been supplied by the orphanage.

Notwithstanding the absence of further particulars, the Ferencs nevertheless traveled to Russia at the end of October, 1994,

---

1. Also named as co-defendants are The Frank Foundation Child Assistance International, Inc., a non-profit corporation that assisted WCI in identifying Alexander as available for adoption, and two Russian nationals who have never been served with process and are not presently before the Court.

2. The Ferencs adopted the second child as well, a girl, at the same time they adopted Alexander. Her health is presumably unremarkable and her adoption not in issue in this case.

intending to continue with the adoption process. They were met on arrival in Moscow by a "coordinator" (presumably arranged for by WCI or The Frank Foundation, although paid directly by the Ferencs) who took them to the orphanage at Tver. There the Ferencs observed Alexander in person and spoke with the chief physician who had prepared the abstract. She told them that Alexander's strabismus was surgically correctable, and that the peculiarities they perceived in his posture and gait were due to "nutritional deficiencies." She was aware, she said, of no other medical problems. The Ferencs were reminded of their right to decline to go forward with the adoption if they chose to do so.

Again the Ferencs elected to proceed, and they returned from Tver to Moscow that night with Alexander enroute to the United States. Prior to departure, and as they understood to be required by U.S. immigration authorities, they had Alexander examined by Russian physicians at a Moscow clinic who pronounced him "generally healthy." While awaiting their flight home in Moscow, they were also told by the coordinator, whose source of information is not given, that Alexander's mother had died of "intoxication."

Since his arrival in the United States, Alexander has been diagnosed as microcephalic, and afflicted with an attention deficit/hyperactivity disorder. He also exhibits what may be fetal alcohol syndrome, and his strabismus has been determined to be inoperable.

## II.

▇ The sole basis asserted for this Court's subject matter jurisdiction of this case is diversity of citizenship. 28 U.S.C. § 1332. Thus the Court is obliged to apply the law of the District of Columbia in deciding the case. *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). It does not appear that the District of Columbia has yet formally recognized a tort of "wrongful adoption," but on analogy to the tort of "wrongful birth," which the District

has recognized, *see Haymon v. Wilkerson*, 535 A.2d 880 (D.C.1987), and precedents from other jurisdictions,[3] the Court will anticipate the District's recognition of a tort of "wrongful adoption" and assume that plaintiffs' claims are actionable under District of Columbia law.

Counts I and II, respectively, allege that defendants intentionally or negligently misrepresented the state of Alexander's health to the Ferencs, assuring them that he was essentially a healthy child whose deficits, if any, were minimal, transient, and/or amenable to correction with medical treatment routinely available in the United States. Count III charges that defendants intentionally caused plaintiffs to suffer extreme emotional distress.

▇ To make out a *prima facie* case of intentional misrepresentation, plaintiffs must prove that defendants (1) made a false representation, (2) regarding a material fact, (3) with knowledge that the representation was false, (4) with intent to deceive, and (5) which induced action in reliance on the representation. See *Bennett v. Kiggins* 377 A.2d 57, 59 (D.C.1977), *cert. denied*, 434 U.S. 1034, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978). Similarly, the elements of negligent misrepresentation are (1) negligent communication of false information, (2) which the defendants anticipated or should have anticipated was likely to induce action or inaction by the plaintiff, (3) and on which the plaintiff did reasonably rely. See *Kirkland & Ellis v. Ruiz–Mateos*, 923 F.Supp. 255, 262 (D.D.C.1996) (citing *Hall v. Ford*, 445 A.2d 610, 612 (D.C.1982)).

▇ To prevail on their claim of intentional infliction of emotional distress, the Ferencs must prove that defendants engaged in (1) extreme and outrageous conduct, (2) that intentionally or recklessly caused them to experience (3) severe emotional distress. See *Waldon v. Covington*, 415 A.2d 1070, 1076, (D.C.1980).

The parties' dispute centers on whether defendants misrepresented any facts, inten-

---

**3.** *See Mohr v. Commonwealth*, 421 Mass. 147, 653 N.E.2d 1104 (1995); *Mallette v. Children's Friend and Service*, 661 A.2d 67 (R.I.1995); *Gibbs v. Ernst*, 538 Pa. 193, 647 A.2d 882 (1994);

*Roe v. Catholic Charities of the Diocese*, 225 Ill. App.3d 519, 167 Ill.Dec. 713, 588 N.E.2d 354 (App.Ct.1992).

tionally or otherwise; whether plaintiffs relied on any such misrepresentations; whether WCI or The Frank Foundation is liable for any misrepresentations made by non-moving defendants; and, finally, whether plaintiffs are divested of any or all of the claims they now assert by the terms of their contract with WCI.[4]

■ Count III, charging defendants with intentional infliction of emotional distress, is the most easily dispatched. The record contains absolutely no evidence from which a jury could find (nor any reason to expect that such evidence will be forthcoming) that any defendants who are now before the Court intended that the Ferencs experience any emotion other than the joy that should attend the adoption of a healthy son. No motive, ulterior or otherwise, is shown for these defendants to have deliberately deceived the plaintiffs as to Alexander's health, and no conduct is ascribed to them that in any respect resembles the "extreme or outrageous conduct" that has been held necessary to prove the tort under District of Columbia law. *See Waldon v. Covington* 415 A.2d 1070, 1076–78 (D.C.1980); Restatement (2d), Torts § 46.

■ As is the case with Count III, the allegations of intentional fraud in Count I as well are vulnerable to summary disposition on the evidentiary record. Count I presumes proof that defendants were fully informed of Alexander's multiple deficits and consciously elected to conceal the truth from plaintiffs. The WCI defendants profess to have received no medical information about Alexander other than that which they immediately imparted in its entirety to the Ferencs, and there is no evidence to the contrary. Even were the Court willing to impute to WCI and The Frank Foundation all knowledge in the possession of all co-defendants, including the unserved Russian co-defendants, the hypothesis that they or any of them knew Alexander to be more severely impaired than they made known to the Ferencs remains no more than a hypothesis on this record. For the Court to allow a jury to find otherwise would be to countenance an exercise in xenophobic speculation.

■ Count II, alleging negligent misrepresentation, is the most promising of plaintiff's several theories of liability. The record could support a finding that the WCI and The Frank Foundation defendants were ignorant of Alexander's true condition and made no reasonable efforts to ascertain it, while allowing plaintiffs to believe that their optimistic assurances were predicated on knowledge they did not have. The cases cited by plaintiffs from other jurisdictions hold that there is a common law duty imposed upon adoption agencies to investigate the background of prospective adoptees with reasonable care and to fully inform their client adoptive parents of the results.[5]

■ The duty originates, however, in the contractual relationship between the parents and the agency, and its scope may, by agreement of the parties, be varied by the terms of the contract. *See Howard Univ. v. Best,* 484 A.2d 958, 966–67 (D.C.1984).

In the instant case the contract between the Ferencs and WCI is expressed in writings that clearly diminish WCI's investigatory responsibility to an absolute minimum. It purports, in fact, to absolve WCI and The Frank Foundation of any duty at all, by expressly waiving at its inception "any and all claims" that might arise in favor of plaintiffs from the relationship. Moreover, the several documents comprising the contract are elsewhere rife with cautionary language respecting the "risk" of foreign adoptions, including the fact that WCI and The Frank Foundation would furnish "medical and social information" when it was "available," but that they could not guarantee its complete-

---

4. Defendants bear the burden of demonstrating that, upon undisputed material facts, they are entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1985). All reasonable inferences must be drawn in plaintiffs' favor.

See *Tao v. Freeh,* 27 F.3d 635, 638 (D.C.Cir. 1994).

5. *See* cases cited at fn. 3. Plaintiffs also cite various District of Columbia regulations to essentially the same effect.

ness or accuracy. By the contract the Ferencs acknowledged that their child could possibly arrive "with undiagnosed physical, emotional and/or developmental problems." With respect to Russian children in particular, the September 28th supplement contains nearly two pages of text advising of "ambiguous clinical diagnoses" by Russian physicians and the "problematic state" of Russian medical education and proficiency. At several places it states that the prospective adoptive parents are not obliged to accept a child who they believe is not healthy. (Def. Ex. 4, "Memo of Understanding," pp. 2–3.)

Whether the exculpatory effect of the waiver clause would indeed reach "any and all claims" of any description (such as those of Counts I and III) is unnecessary to decide. The waiver clause clearly served notice to plaintiffs that WCI and The Frank Foundation did not warrant the success of their efforts, and did not expect to be liable, in whatever respect they might fail or the reasons for its failure, for a less than wholly satisfactory adoption.

■ Exculpatory contract provisions are valid and enforceable in the District of Columbia. *See Maiatico v. Hot Shoppes, Inc.,* 287 F.2d 349, 350 (D.C.Cir.1961); *Potomac Plaza Terraces, Inc. v. QSC Products, Inc.,* 868 F.Supp. 346, 353–54 (D.D.C.1994). Plaintiffs have presented no contrary authority [6] nor offered reason why the waiver clause should not, in the circumstances, be given the effect it was obviously intended to have and to which plaintiffs, by their conduct as well as their signatures, signified their assent.

Plaintiffs argue that the contract is ambiguous; they were, they say, unaware of its import as relieving WCI or The Frank Foundation of any liability for the expense, not to mention the anguish, of raising a severely handicapped child. Yet at virtually every stage of the process, the Ferencs sought reassurance from independent sources that their forebodings were unfounded. They consulted an American physician in New Jersey. They personally observed Alexander, queried the Russian physician in charge of the orphanage at Tver about peculiarities they noticed in his appearance, and consulted still other doctors in Moscow immediately prior to their return to the United States. Their actions in that regard are consistent only with an understanding on their part that they alone bore the risk of Alexander's true condition.

For the foregoing reasons it is, this 19th day of September, 1997,

ORDERED, that the motions of defendants World Child, Inc., Adams, Goolsby, and Geer and of the co-defendant The Frank Foundation for summary judgment are granted, and the complaint is dismissed with prejudice as to said defendants; and it is

FURTHER ORDERED, that the complaint is dismissed without prejudice as to defendants Tatiana Kamneva and Galina Smirnova pursuant to Fed.R.Civ.P. 4(m); and it is

FURTHER ORDERED, that the Clerk enter final judgment for defendants World Child, Inc., Sherrell Goolsby, Barbara Geer, Veronica Adams, and The Frank Foundation Child Assistance International, and against plaintiffs Joseph Ferenc and Julie Ferenc, with costs.

---

6. *Kraft v. Lowe,* 77 A.2d 554 (D.C.1950) is inapposite. No inaccurate representations are alleged to have induced the Ferencs to enter into the contract in the first place. The representations of which they complain all occurred after they had agreed upon the terms upon which services would be furnished by WCI and The Frank Foundation, but before they had committed finally to the adoption.