**Anne V. SHERMAN, Appellant,**

v.

**ADOPTION CENTER OF WASHINGTON, INC., et al., Appellees.**

**No. 98–CV–737.**

District of Columbia Court of Appeals.

Argued April 13, 1999.

Decided Dec. 9, 1999.

---

Harvey Schweitzer, with whom Leslie Scherr, Bethesda, MD, was on the brief, for appellant.

Craig S. Brodsky, Washington, DC, with whom Jeffrey J. Hines, was on the brief, for appellees Adoption Center of Washington, Linda Brownlee and Marlene Drucker.

Pamela M. Deese, with whom Eric S. Jackson, Washington, DC, was on the brief, for appellee Nina Kostina.

Before WAGNER, Chief Judge, STEADMAN, Associate Judge, and KERN, Senior Judge.

STEADMAN, Associate Judge:

This case involves a dispute about the liability of an adoption agency when a foreign-born child adopted by an American client turned out to have medical problems. The appellant, Anne V. Sherman, adopted a Russian baby girl who was discovered to be carrying the hepatitis C virus when the girl was examined by a pediatrician in the United States. Sherman sued the Adoption Center of Washington and several of its employees[1] for breach of contract, "wrongful adoption/malpractice" and related counts. Ultimately the trial court granted summary judgment in favor of the defendants on all counts. The trial court also denied Sherman's motion to amend her complaint to include fetal alcohol syndrome/fetal alcohol effect as an additional infirmity of the child. We affirm both orders.

## I. Facts

Appellant Sherman adopted an eleven-month old baby girl, Irina, from Russia around the end of May 1993. Sherman first thought to pursue adoption of a Russian child based on a Montgomery County newspaper article she read in September 1992.[2] The article discussed the fact that many Russian children were available for adoption, that older parents could adopt them, and that the waiting period was not extensive.[3] The article mentioned Nina Kostina of the Franklin Adoption Center, now the Adoption Center of Washington (ACW). Sherman called Kostina at the end of December 1992 and was referred by her to ACW Executive Director Linda Brownlee. The adoption process began formally with the execution of a contract between Sherman and ACW (then operating under its original name, Franklin Adoption Center) on February 18, 1993. The contract included a caveat as follows:

[Sherman] understand[s] that Franklin Adoption Center, Inc. cannot guarantee the health of the child, but will make best efforts to insure that the child's health is known to the parent(s) prior to placement. However, [Sherman] understand[s] that it is very difficult to know all of the health issues involved.

In addition to this contract language, Sherman was made aware that even though ACW knew her highest priority was adoption of a healthy baby,[4] no baby available for adoption would have a clean medical record because Russian law at that time prohibited foreign adoption of healthy Russian babies. Further, Russian orphanages rarely supplied prospective foreign parents with complete medical histories of children available for adoption.

ACW located Irina as a potential adoptee on April 27, 1993. A photograph and an October 1992 medical excerpt (three

1. The employee defendants are Nina Kostina, Linda Brownlee, and Marlene Drucker.

2. Sherman had been turned away from a Catholic adoption agency because of her status as a divorcee, and her age of 39. She concluded domestic adoption would be too difficult for her.

3. This newspaper article included statements from other agencies that they found medical information and family background information too limited in the case of Russian adoptees, and thus affirmatively chose not to work with Russian orphanages.

4. In fact, for this reason, she declined to pursue possible adoption of two children made available to her because the babies possibly had cleft palates.

pages long when translated into English) were the only documentation made available to Sherman or ACW, as was the standard practice in Russian adoptions at the time. The medical excerpt referenced one hospitalization for a respiratory infection, negative results on blood tests for HIV and hepatitis B, some developmental delays, and a diagnosis that loosely translated as "encephalopathy." Marlene Drucker, an ACW social worker, explained that "encephalopathy" is a general diagnosis applied often to Russian babies with unusual birth circumstances, such as either lengthy or rapid labor, C-section deliveries, or older mothers. She further stated based on her experience that Irina's record indicated she was in the best health Drucker had seen. Even so, Drucker advised Sherman to get the excerpt reviewed by an emigrated Russian physician residing in Maryland, Dr. Anna Schvarts.

After reviewing the brief record, Dr. Schvarts confirmed that "encephalopathy" usually meant any of a multitude of birth circumstances and did not necessarily present cause for concern, and also explained that institutionalized children often had developmental delays that resolved themselves when the children were placed in home environments. Nonetheless, Dr. Schvarts developed a list of questions for Sherman to pursue prior to adoption, and referred her to Dr. Nina Scribanu as another medical resource. Dr. Scribanu essentially confirmed what had been explained by Dr. Schvarts, and went into further detail about the developmental delays typical of children in orphanages. Sherman took the additional precaution of having the medical excerpt reviewed by her sister, a nurse and attorney by training, who advised her to request additional information.

Sherman attempted to get the questions from Dr. Schvarts answered through Brownlee at ACW, but Brownlee was unable to glean any additional information from the orphanage. Additionally, Kostina called ACW's coordinator in Russia to obtain follow-up information, and after her conversation in Russian related to Sherman that she had been told Irina "was doing beautifully and healthy and was doing well." Sherman was informed her best chance of getting more medical information would be a direct visit with the orphanage staff.

Armed with these facts and advice, Sherman traveled to Russia in May, accompanied by her brother. There, on three occasions over a period of about four days, she met with the orphanage director, Dr. Truba, and saw Irina. She asked Dr. Truba questions about Irina's medical history,[5] was told of a second hospitalization for bronchitis, and was assured that Irina was completely recovered. She was not allowed to see or copy Irina's medical file because, according to Dr. Truba, government regulation would not allow the disclosure. When Sherman pressed on and asked if there was any other information she should know about that would be relevant to Irina's health, she was assured there was nothing.

Before leaving for the United States, Irina underwent a physical for immigration purposes. The immigration physician noted that Irina had an enlarged liver, and surmised the symptom was connected to rickets. At that time, in 1993, Russia did not have a test to determine if a person was infected with hepatitis C.[6] Upon her first visit with a pediatrician in the United States, the pediatrician also noted Irina's enlarged liver but decided to run additional blood tests for a possible hepatitis C infection. The test results were positive for the hepatitis C virus (also known as HCV). Irina was referred to NIH, where studies were being conducted on this virus, first identified as a separate strain of hepatitis in 1989. According to Sherman, a physician at NIH, Dr. Lazarev, called Rus-

---

**5.** Sherman did not ask Dr. Truba all of the questions from Dr. Schvarts' recommended list.

**6.** See also note 10, *infra.*

sia and learned from Irina's physicians there that she had undergone blood transfusions when hospitalized, and concluded this is most likely how the child contracted the virus. Irina is under supervision to monitor and treat her disease through a program at NIH.

Additionally, Sherman noted that Irina exhibited increasingly disturbing behavioral problems. In October of 1997,[7] Sherman had Irina evaluated by a psychologist who concluded that Irina may be suffering from fetal alcohol syndrome/fetal alcohol effect (FAS/FAE). The psychologist recommended Irina be evaluated by a pediatric neurologist, but such an evaluation would not be available until January of 1998.

Sherman filed her initial complaint on March 13, 1996, claiming breach of contract, breach of fiduciary duty, fraud, negligent misrepresentation, "wrongful adoption/malpractice," and intentional infliction of severe emotional distress based on the defendants' failure to uncover or disclose the diagnosis of hepatitis C or the fact that Irina had had blood transfusions, and defendants' affirmative representations that the child appeared healthy. Discovery was initially set to close in February of 1997. On April 18, 1997, Judge Queen granted summary judgment with respect to the emotional distress claim;[8] however, apparently based on Sherman's representations regarding expected expert testimony on adoption agencies' standard of care, Judge Queen declined to grant summary judgment on the remaining counts at that time and instead extended discovery.[9] Discovery closed in September of 1997, whereupon defendants began to prepare renewed motions for summary judgment.

On November 10, 1997, Sherman moved to add FAS/FAE to her damages claim. Judge Queen denied leave to amend on December 31, 1997. Judge Lopez, to whom the case was reassigned after a calendar change, granted the defendants' renewed motions for summary judgment on April 10, 1998. Sherman appeals both rulings.

## II. Summary Judgment

 We apply here the familiar and oft-stated standard of review of grants of summary judgment. Super. Ct. Civ. R. 56(c) provides for summary judgment when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Hence a party may succeed on its motion for summary judgment where "(1) taking all reasonable inferences in the light most favorable to the nonmoving party, (2) a reasonable juror, acting reasonably, *could not* find for the non-moving party, (3) under the appropriate burden of proof." *Gross v. District of Columbia*, 734 A.2d 1077, 1083 (D.C.1999)(quoting *Nader v. de Toledano*, 408 A.2d 31, 42 (D.C.1979), *cert. denied*, 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980)) (emphasis in original). In responding to a motion for summary judgment, the non-moving party may not rest upon mere allegations or conclusory statements but must, through affidavits or as otherwise provided in Rule 56, set forth specific facts showing there is a genuine issue for trial. *Beard v. Goodyear Tire & Rubber Co.*, 587 A.2d 195, 198–99 (D.C.1991) (citing Super. Ct. Civ. R. 56(e)).

7. The decision to have Irina evaluated by a psychologist was instigated by new counsel retained by Sherman at about that time. This same attorney had represented the plaintiffs in *Ferenc v. World Child, Inc.*, 977 F.Supp. 56 (D.D.C.1997), *aff'd without op.*, 172 F.3d 919 (D.C.Cir.1998), discussed *infra*, where adoptive parents similarly claimed their child exhibited FAS, along with other medical problems.

8. This grant of summary judgment is not challenged on appeal.

9. Although the transcript and order from that proceeding are not in the record on appeal, defendants' opposition to the motion to amend states that Judge Queen expressed her willingness to reconsider the summary judgment motion after the new discovery period ended.

We first address the claim based on breach of contract; viz., that ACW would make "best efforts" to acquire information on the child's health, while recognizing the great difficulty in knowing all the health issues involved, and the disclaimer of any guarantee about the physical condition of the child. It is undisputed that none of the defendants was aware of Irina's HCV status or her transfusions prior to her diagnosis in the United States. It is further undisputed that none of the defendants withheld any medical information made available to them. Sherman also admitted she was aware that her access to medical information would be limited. Therefore, the only actionable claim for breach would require proof that additional effort on the part of defendants would have uncovered the presence of the hepatitis C virus in Irina. However, given Sherman's own inability to receive that detailed information even after an in-person visit to the orphanage, equipped with a medical professional's advice as to the types of additional questions that needed to be answered, the court correctly concluded no reasonable jury could find that defendants would have had better success in obtaining the information.[10] The trial court also focused on the fact that Sherman adopted Irina knowingly in the face of incomplete information, although she had no obligation to go through with the process at all, and certainly not within the brief time frame she imposed on herself, limiting the investigatory work that could be done. Thus even if defendants had fallen somehow short of "best efforts" to obtain medical information, a conclusion the record does not support, causation could not be proven when Sherman hastened to proceed with an adoption aware both through the cautionary contract language and her own research of the risks the decision involved. For these reasons, we conclude that summary judgment was properly granted on Sherman's claims based on a breach of duty by the defendants.[11]

We turn to the misrepresentation and fraud claims. To prove fraud in this case, Sherman must offer evidence of conscious concealment of a material fact. *See Lund v. Watergate Investors Ltd. Pshp.*, 728 A.2d 77, 86 (D.C.1999) (citing *Pyne v. Jamaica Nutrition Holdings Ltd.*,

10. Sherman suggests that defendants at least should have learned about the blood transfusions. The importance of asking specifically about transfusions was not noted by either of the medical specialists from whom Sherman sought counsel. Indeed, while Dr. Schvarts did advise Sherman that she get an updated HIV test (a suggestion she did not pursue), she never recommended an HCV test. Russia did not test for hepatitis C until 1994.

Sherman points to the ease with which NIH Doctor Lazarev (who neither appears on Sherman's witness list nor submitted an affidavit) was able to obtain information that Irina had undergone transfusions as proof that "best efforts" on the part of ACW should have uncovered the same information. However, a post-adoption physician-to-physician communication designed to aid in the treatment of a patient with a specific medical condition is not a fair comparison. A closer comparison is the pre-adoption efforts of Sherman herself, as well as the pre-adoption advice of medical experts, neither of which suggested an ability or duty on the part of defendants to determine in advance that a blood transfusion had taken place.

Judge Lopez also noted that it is highly suspect that knowledge of transfusions would have deterred Sherman in her rush to adopt, given that the only blood-borne risks she was aware of were HIV and hepatitis B, and that Sherman neglected to pursue answers to several of the questions she had developed after evaluating Irina's medical excerpt.

11. The same factors negating any liability for breach of contract apply equally to the tort-based claims of breach of fiduciary duty and wrongful adoption/malpractice, as any duties imposed under such theories could not, in the circumstances here, exceed that contained in the contract itself. *Cf. Ferenc, supra* note 7, 977 F.Supp. at 60 (common law and legislative duty of adoption agencies to investigate the background of adoptees stemmed from the contractual relationship between the parties and therefore could be limited contractually). In any event, given the lack of sufficient expert testimony regarding the standard of care, Sherman failed to satisfy the breach element of her claims.

497 A.2d 118, 131 (D.C.1985)) (plaintiff must show "false representation of material fact which is knowingly made with the intent to deceive and action is taken in reliance upon the misrepresentation"). As mentioned above, it is undisputed that appellants' did not conceal any medical information known to them. Negligent misrepresentation requires that the defendants made statements that they knew or should have known were false, and that they knew or should have known would induce reliance on the part of Sherman, and that did induce such reliance. *Hall v. Ford Enterprises, Ltd.,* 445 A.2d 610, 612 (D.C. 1982). Again, it is clear the defendants neither knew nor by reasonable diligence could have known about the medical information Sherman now claims she lacked. Nor did they know or have reason to know that representations about the general healthiness of the child, confirmed both by the orphanage director and the immigration physician, were false. Equally importantly, Sherman's actions demonstrated that she did not rely on statements made by the defendants. She educated herself through books and meetings, sought review of the medical excerpts by physicians, and tried to get at least some of her additional questions answered before proceeding with her adoption.

In its overall aspects the case before us bears some resemblance to the recent federal case in this jurisdiction of *Ferenc, supra* note 7. In *Ferenc,* a couple entered an agreement with an adoption agency for assistance in locating and adopting a Russian child. The adoption agency provided a picture of the child and a translated medical abstract, which, as noted earlier, is consistent with the extent of information Russian orphanages were willing to provide agencies at that time. The couple unsuccessfully tried to acquire additional medical information, ultimately traveled to Russia and met with the orphanage director and the child, and chose to go through with the adoption based on the limited information available. After returning to the United States, the child was diagnosed with a number of medical problems, and the parents sued the adoption agency. The court granted summary judgment in favor of the defendants.[12]

In sum, for the foregoing reasons, we conclude that summary judgment was properly granted in this case on all the remaining counts [13] of plaintiff's complaint.

### III. Motion to Amend

■■■ Once a responsive pleading is served, a party may amend a prior pleading "only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Super. Ct. Civ. R. 15(a). We review a trial court's decision to grant or deny leave to amend for abuse of discretion. *Johnson v. Fairfax Village Condo. IV,* 641 A.2d 495, 501 (D.C.1994). The court has "wide discretion" in such matters. *Blake Constr. Co. v. Alliance Plumbing & Heating Co.,* 388 A.2d 1217, 1220 (D.C.1978). "In the absence of manifest error, amounting to an abuse of that discretion, the decision of the trial court to grant or deny such motion is not reviewable on appeal." *Vasaio v. Campitelli,* 222 A.2d 710, 711 (D.C.1966) (citation omitted).

■■■ Both prongs of the standard in Rule 15(a) bear upon the issue. The rule is to be applied with a "prevailing spirit of liberalism ... when justice will be so served." *District of Columbia v. Tinker,* 691 A.2d 57, 60 (D.C.1997)(quoting *Eagle Wine & Liquor Co. v. Silverberg Electric Co.,* 402 A.2d 31, 34 (D.C.1979)). Nonetheless, that liberalism does not mean amend-

**12.** The contract between Sherman and ACW utilized limiting and cautionary language as did the contract at issue in *Ferenc,* with the potentially significant difference that the *Ferenc* contract contained an explicit waiver. But we do not think that the absence of such a waiver is determinative in the circumstances of the case presently before us.

**13.** As already noted, the grant by Judge Queen of summary judgment on the count of intentional infliction of emotional distress is not challenged on this appeal.

ments must be granted automatically; "[a] refusal to allow an amendment is to be upheld if predicated on some valid ground." *Eagle Wine, supra,* 402 A.2d at 34. In determining whether "justice so requires" the grant of a motion to amend, we take note of five factors: (1) the number of requests to amend made by the movant; (2) the length of time the case has been pending; (3) bad faith or dilatory tactics on the part of the movant; (4) the merit of the proffered pleading; and (5) prejudice to the nonmoving party. *Johnson v. Fairfax Village Condo. IV, supra,* 641 A.2d at 501.

While Sherman made only one motion to amend her complaint, we think that consideration of the other factors demonstrates that the court's decision to deny the motion to amend was not manifestly erroneous so as to constitute an abuse of discretion. First, appellant's motion came one year and eight months after she filed her initial complaint. The filing of the complaint itself was almost three years after the events in question, at the limit of the statute of limitations. Thus, the amended complaint would address matters that had occurred a half-decade earlier.[14] Furthermore, the motion came a full two months after discovery had closed.[15]

To be sure, the passage of time and close of discovery preceding a motion to amend do not ordinarily in and of themselves call for denial of the motion; they are only some of the factors that inform the decision as to whether "justice so requires" leave to grant the motion. *Eagle Wine, supra,* 402 A.2d at 35. But it is also appropriate for the court to examine the proffered reason for the lengthy delay and a possible "unacceptable dilatory approach." *Molovinsky v. Monterey Co-op., Inc.,* 689 A.2d 531, 534 (D.C.1996). In the peculiar circumstances here, this inquiry blends into an examination as well of the merit of the proffered pleading.

Appellant's explanation for the delay in asserting FAS/FAE as an added physical infirmity was that a psychologist had suggested that Irina "may be suffering" from FAS/FAE.[16] There is no explanation why the possibility of FAS/FAE was never previously discovered during the nearly five years of close medical supervision of the child after her arrival in this country from Russia. Yet, at the same time, Sherman links her new claim to the case by asserting that the condition was manifesting itself through the developmental delays noted in the medical excerpt and acknowledged by the defendants and physicians who reviewed the excerpt as typical but reparable symptoms for institutionalized children. Other attacks on the merit of the amendment, though not specified in the court's order, appeared in the appellees' opposition to the motion to amend, including the fact that appellant herself was advised by Dr. Schvarts to investigate the possibility of FAS and was unable herself to unearth satisfactory answers to necessary background questions at the orphanage. The court appropriately included in its calculus the apparent lack of merit in the amended complaint, just as in the original complaint.

In short, Sherman's cause of action against the defendants is based on the

---

**14.** With the relation back treatment given to such amendments, the statute of limitations that might otherwise apply would be inapplicable.

**15.** Sherman claims the amendment should not be considered untimely, since the trial date was ultimately set for over a year later. However, at the time the motion was filed, the parties and the court did not have a set trial date. The Joint Pre–Trial Statement, dated November 13, 1997, stated "[t]he Defendants are prepared to proceed to trial, however, Sherman seeks to have her complaint amended and conduct additional discovery at this time." The trial date was likely delayed by the happenstance of the calendar switch of judges in January of 1998.

**16.** She also asserts in her brief to us (although not to the trial court) that her awareness of the FAS/FAE diagnosis stemmed from valuable information gained during discovery, but this assertion is not further elaborated in any way.

proposition that they should have discovered the medical problems that afflict the child. If FAS/FAE was discernible at the time of adoption, then the delay could not fairly be excused. If it was not, the cause of action had no basis. The grant of summary judgment as to the hepatitis C condition would be equally applicable to the attempted amendment.

It is also relevant to note that Sherman's motion was filed after a partial summary judgment which eliminated Sherman's primary basis for damages,[17] and before an impending renewal of a motion for summary judgment on the remaining counts based on the lack of any new evidence in favor of Sherman uncovered during the extended discovery period. We have found in similar circumstances "[t]he timing of the motion, filed only after defeat seemed imminent, was suggestive of an unacceptable dilatory approach." *Molovinsky, supra*, 689 A.2d at 534 (discovery had been completed, summary judgment granted on one claim, and likely foreclosure of other claims based on statute of limitations). In such cases we scrutinize with care the legitimacy of the movant's explanation for its delay. *Id.*

We have stated that prejudice can in part "rest on findings that the moving party has not put forth any satisfactory reason for the delay ...." *Eagle Wine, supra*, 402 A.2d at 35. In her motion to amend, Sherman acknowledged that the trial would have to be delayed and discovery reopened. *See Howard University v. Good Food Services, Inc.*, 608 A.2d 116, 121 (D.C.1992) (noting prejudice to party caused by "disruption of the previously agreed upon schedule" and by "additional discovery time—and the expense that entails"). Defendants without warning would be required to investigate matters that had occurred almost five years previously, some of them in a far-off land. The threat

of a law suit casting aspersions at their professional competence would continue to hover for an extended period over their business. Furthermore, as we have reiterated on several occasions, prejudice caused by delays and postponement of this type affect not only the individual litigants but the court system as a whole and others who invoke its aid in dispute resolution. *See, e.g., Perry v. Sera*, 623 A.2d 1210, 1219 (D.C.1993).

Considering all of the facts and circumstances of this case, we are satisfied that the trial court did not abuse its discretion in denying the belated motion to amend. The orders appealed from are hereby

*Affirmed.*

---

17. As already noted, the defendants' motion for summary judgment on the intentional infliction of emotional distress count was granted and is not contested on appeal. It is virtually conceded that damages relating to the hepatitis C infection are limited to some

$8,000, the costs of testing up to the age of 21. That particular condition rarely manifests itself in perceptible harm requiring significant medical expenditures during childhood.