**VIRGINIA ACADEMY OF CLINICAL PSYCHOLOGISTS, et al., Appellants,**

v.

**GROUP HOSPITALIZATION AND MEDICAL SERVICES, INC., d/b/a Blue Cross/Blue Shield of the National Capital Area, et al., Appellees.**

**No. 03–CV–392.**

District of Columbia Court of Appeals.

Argued June 22, 2004.

Decided July 14, 2005.

---

Dwight P. Bostwick, with whom A. Katherine Toomey, Washington, DC, Russ Newman, Shirley Ann Higuchi and Alan Nessman were on the brief, for appellants.

Keara M. Gordon, New York, NY, and Paul W. Jacobs, II, Richmond, VA, with whom David Clarke, Jr., Reston, VA, Sara Z. Moghadam, Washington, DC, Jonathan M. Joseph and Roman Lifson, Richmond, VA, were on the brief, for appellees.

Before SCHWELB and WASHINGTON, Associate Judges, and STEADMAN, Senior Judge.*

STEADMAN, Senior Judge.

This lawsuit arose from the marketing and management of mental health care benefits under the Capital Choice Triple Option ("Capital Choice") health insurance plan. The plaintiffs consisted of three groups; namely, two individual subscribers to the Capital Choice Plan, six clinical psychologists who provided services under the plan, and a professional association of clinical psychologists. They sued the appellee insurance companies and insurance benefit administrators for, *inter alia,* common law fraud based on two alleged misrepresentations about the scope of mental health coverage under the Capital Choice plan.

The principal issues on appeal are whether the trial court erred in (1) granting summary judgment on the common law fraud count; and (2) denying a motion to amend the complaint to include a claim for fraud under the District of Columbia Consumer Protection Procedures Act.[1] We affirm.

---

* Judge Steadman was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on October 18, 2004.

1. Appellants also challenge the trial court's striking of their prayer for punitive damages. In light of our disposition of the other issues on appeal, we need not reach that issue because there is no predicate claim to support an award of punitive damages. *See Aurora Assocs. v. Bykofsky,* 750 A.2d 1242, 1247 (D.C. 2000).

## I. Facts

Marjorie Burdetsky switched jobs in the fall of 1997 and had to choose a health insurance provider for herself and her husband, Joaquin Araya, through her new employer, the Arlington County, Virginia government. At the time, Araya was receiving mental health treatment. Burdetsky's options included three types of plans from Blue Cross Blue Shield of the National Capital Area (Blue Cross)[2]: a managed care (HMO) option, preferred provider organization (PPO) option, or an indemnity plan.[3] Blue Cross also offered a hybrid insurance plan, the Capital Choice Triple Option plan, under which Burdetsky and her husband could choose among the three different types of insurance coverage (HMO, PPO, and indemnity) each time they sought medical care. Burdetsky also had the choice of a plan offered by another insurance company, Kaiser Permanente. Burdetsky chose the Capital Choice Triple Option plan, which had lower co-payments than the Blue Cross PPO or indemnity plans and more mental health benefits than the Kaiser Permanente plan.[4] Burdetsky completed an enrollment form on December 1, 1997, and her insurance coverage became effective on January 1, 1998.

Health Management Strategies International, Inc. ("HMS"), as the administrator of mental health benefits for the Capital Choice plan, was charged with creating and maintaining the mental health provider panel for the Capital Choice plan and assessing the needs of subscribers for services under the plan. By contracting to be in HMS' network, providers agreed to see patients with Capital Choice insurance and comply with administrative procedures required by HMS. The providers were then paid according to a contracted-for fee schedule.

In the fall of 1997, while Burdetsky was choosing among her health insurance options, HMS implemented a new fee schedule that reduced the amount providers were paid by the insurance company for their services. On November 24, 1997, HMS mailed a letter to every provider on the mental health panel explaining that there would be a 30–40% cut in their reimbursement rates effective January 1, 1998. Approximately 100 mental health professionals out of a total panel of approximately 1000 providers left the provider network as a result of the rate cut. The six clinical psychologists who are appellants here were among those who had contracted with HMS to provide mental health services to patients covered by the Capital Choice plan and were affected by the rate cut.

---

**2.** Blue Cross sold insurance products for two District of Columbia corporations, Group Hospitalization and Medical Services Inc. ("GHMSI") and CapitalCare Inc., who, along with Blue Cross, are both appellees in this case.

**3.** In a deposition, associate general counsel for one of the appellees described the three plans as follows: Indemnity is traditional insurance coverage where a subscriber seeks medical care and then submits a claim to the insurance company. A PPO plan requires a subscriber to choose from a panel of select providers, or the subscriber can "opt out" and use providers outside the network for a higher rate of co-payment by the subscriber. In a PPO plan, the subscriber chooses each time he or she seeks medical treatment whether to obtain services in the network or to opt out. A straight HMO plan provides that, unless there is a need for emergency medical care, the subscriber agrees to select a provider only from the panel and may not go outside the network.

**4.** The Kaiser Permanente insurance plan offered to Burdetsky had a mental health component that, in her words, was "very limited" and encouraged "group activities before they would authorize individual sessions."

Before being covered under the Capital Choice plan, Burdetsky's husband, Joaquin Araya, had already been receiving treatment beginning in July 1997 from Dr. John Gualtieri, a clinical psychologist and a provider appellant, for depression and post-traumatic stress disorder. Dr. Gualtieri was listed as both an HMO and a PPO provider in the Capital Choice plan materials. In January 1998, Dr. Gualtieri's treatment of Araya continued, now under the HMO portion of the new Capital Choice insurance plan. The plan also offered the opportunity to receive services from Dr. Gualtieri under the PPO coverage at a higher rate of co-payment than under the HMO. After February 6, 1998, Araya's treatment with Dr. Gualtieri continued but under the PPO coverage, despite that fact that the insurance benefits booklet relating to the Capital Choice plan stated that mental health treatment was covered in full under the HMO for "up to 52 visits" per calendar year.[5]

The instant litigation began in December 1998 when a wide-ranging nine-count complaint was filed by all appellants alleging two counts of fraudulent misrepresentation, four counts of breach of contract, two counts of breach of implied contract, and one count of tortious interference with a business relationship. The claims and their resolution in the course of the extended trial court proceedings were as follows:

| Count | Description of Cause of Action | Plaintiff Group | Resolution |
| --- | --- | --- | --- |
| One | Fraudulent Misrepresentation | Burdetsky & Araya | Summary judgment for defendants |
| Two | Breach of Contract | Burdetsky & Araya | Settled |
| Three | Breach of Implied Contract | Burdetsky & Araya | Settled |
| Four | Breach of Contract (patient care) | Psychologists | Abandoned |
| Five | Breach of Implied Contract | Dr. Gualtieri, Dr. Chilstrom | Summary judgment for defendants |
| Six | Breach of Contract (wrongful termination) | Dr. Potter | Summary judgment for defendants |
| Seven | Breach of Contract (implementation of rate reduction) | Psychologists | Settled |
| Eight | Fraudulent Misrepresentation | Dr. Potter | Summary judgment for defendants |
| Nine | Tortious Interference with Business Relationship | Dr. Gualtieri, Dr. Chilstrom, Araya | Summary judgment for defendants |

The only resolutions of these claims challenged on appeal relate to the grant of summary judgment on Burdetsky and

5. Prior to Araya's switch to PPO coverage, Dr. Gualtieri recommended that Araya have sessions twice a week. HMS denied visits with Dr. Gualtieri at this frequency, but did approve six additional HMO sessions over a six week period.

Araya's common law fraud claim and the refusal to allow an amendment to the complaint, described in the following paragraph.

The common law fraud claim filed in December 1998 by Burdetsky and Araya was based on two specific instances of alleged misrepresentation by appellees: (1) the informational materials for the plan say that the HMO will cover up to 52 medically necessary sessions but Araya received only 5 HMO covered sessions under the Capital Choice plan before being induced to switch to the PPO coverage; and (2) the size and stability of the panel of providers was falsely represented because appellees had just embarked on a rate cut that consumers were not warned about when they were recruited with materials that included the large provider list. Appellants unsuccessfully sought leave to amend the complaint in May 2001 to include two claims under the D.C. Consumer Protection Procedures Act ("CPPA"), D.C.Code §§ 28–3901 *et seq.* (2001), based on the same misrepresentations alleged in the common law fraud claim. The consumers wanted to bring a direct action under the statute, alleging that failure to provide a large, stable panel of psychologists and up to 52 treatment sessions per year through the HMO plan, after representing that the HMO would provide those benefits, constituted unlawful trade practices under the statute. The consumers, psychologists, and appellant Virginia Academy of Clinical Psychologists ("VACP")[6] sought to pursue a representative cause of action under the statute seeking injunctive and declaratory relief all based on the same type of alleged unlawful trade practices but as applied to a broad range of subscribers. The trial court denied the motion to amend in October 2001 on the grounds of undue delay in seeking leave to amend that "was not satisfactorily explained" and prejudice to appellees if the new CPPA claims were permitted at that point in the litigation.

The trial court granted summary judgment for the appellees on the common law fraud claim on June 26, 2002. The trial court ruled that "there is simply insufficient evidence to permit a finding that the defendants acted fraudulently." In particular, the trial court concluded that the appellants did not demonstrate reliance upon the alleged misrepresentations of the appellees in choosing their health insurance plan.[7] The trial court entered a final order and judgment on March 19, 2003 dismissing all remaining claims as moot pursuant to the parties' settlement agreement entered into on March 14, 2003.[8]

## II. Summary Judgment

 In *Weakley v. Burnham Corp.,* 871 A.2d 1167 (D.C.2005), we recently had occasion to reiterate basic principles governing summary judgment. "In order to be entitled to summary judgment, [the defendants] must demonstrate that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. The record is viewed in the light most favorable to the party opposing the

---

6. VACP is a professional association of clinical psychologists practicing in Virginia whose purpose is the advancement of psychology and the encouragement of ethics standards in the practice of clinical psychology. VACP is also listed as a plaintiff in the original complaint, apparently as a representative of its member psychologists, which include the provider appellants.

7. At that time, the trial court also granted the appellees' motion to strike appellants' claim for punitive damages.

8. This ministerial act of dismissing the remaining claims was completed by Judge Herbert B. Dixon, Jr. All of the rulings challenged on appeal were made by Judge Alprin.

motion. On appeal, we must assess the record independently, but the substantive standard applied is the same as that utilized by the trial court. On summary judgment, the court does not make credibility determinations or weigh the evidence. Any doubt as to whether or not [a genuine] issue of [material] fact has been raised is sufficient to preclude a grant of summary judgment. Accordingly, if an impartial trier of fact, crediting the non-moving party's evidence and viewing the record in the light most favorable to the non-moving party, may reasonably find in favor of that party, then the motion for summary judgment must be denied." *Id.* at 1173 (citations omitted). "In order to survive a motion for summary judgment, the non-moving party must present more than mere conclusory allegations." *Teru Chang v. Inst. for Public–Private P'ships, Inc.,* 846 A.2d 318, 323 (D.C.2004) (citation omitted). "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Brown v. George Wash. Univ.,* 802 A.2d 382, 385 (D.C.2002) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "[A] party opposing a motion for summary judgment must produce at least enough evidence to make out a prima facie case in support of [its] position." *Joeckel v. Disabled Am. Veterans,* 793 A.2d 1279, 1281–82 (D.C.2002). And of particular relevance here, "[i]f the claim must be demonstrated by heightened proof to succeed, the nonmovant claimant must produce more substantial evidence to successfully oppose summary judgment." 11 MOORE'S FEDERAL PRACTICE § 56.03[4] (3d ed.2005) (citing *Anderson v. Liberty Lob-*

*by, Inc., supra,* 477 U.S. at 250–53, 106 S.Ct. 2505). "[T]o summarize, the test for deciding a motion for summary judgment is essentially the same as that for a motion for a directed verdict." *Weakley, supra,* 871 A.2d at 1173 (citations omitted).

 The components in this jurisdiction of a successful common law fraud claim are well-settled:

Fraud is never presumed and must be particularly pleaded. It must be established by clear and convincing evidence, which is not equally consistent with either honesty or deceit. The essential elements of common law fraud are: (1) a false representation (2) in reference to material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action is taken in reliance upon the representation.

*Atraqchi v. GUMC Unified Billing Servs.,* 788 A.2d 559, 563 (D.C.2002) (quoting *Bennett v. Kiggins,* 377 A.2d 57, 59 (D.C. 1977)).

We first address each of the two instances of alleged misrepresentation separately,[9] and then discuss the element of reliance with respect to the alleged fraud.

### A.

In support of the first claim of alleged misrepresentation, appellants cite to the "Benefits Booklet" that they received from Capital Choice. The booklet states that, under the "HMO Component" of the plan, mental health services by a "Hospital, Physician, Psychologist, Social Worker, or Licensed Professional Counselor" are "Covered in full for up to 52 visits per calendar year." In a later section, the

---

**9.** The alleged fraud at issue here was as to Burdetsky and Araya as Capital Choice subscribers. We use the term "appellants" without differentiating among the subscribers, providers, and the professional association

because there is no differentiation among appellants as to who is making what arguments. All are represented by the same counsel of record.

booklet says, under a heading that reads "Capital Choice Triple Plan General Exclusions" that any service not "medically necessary for the diagnosis or treatment of an illness" is not covered. The benefits booklet also contains a disclaimer on the inside front cover that states: "The benefits described here are subject to all the terms, conditions, limitations and definitions in the contract, as well as all provisions required by state law. For specific information, the group contract is available for your review from your group administrator." The group contract provides a five-prong definition of "medical necessity."[10]

Appellants assert that the single definition of "medical necessity" in the group contract implies that all three components of the Capital Choice plan (HMO, PPO, and indemnity) are subject to the same requirements to make a finding that treatment is medically necessary. Appellants allege that this was a misrepresentation made to Burdetsky and Araya as prospective subscribers because HMS engaged in an actual practice of denying HMO coverage for sessions that would then be approved as medically necessary under the PPO coverage, for which consumers pay a higher rate. Appellees do not challenge appellants' interpretation of the contract as covering up to 52 visits per calendar year if such visits are "medically necessary," and we will assume, as appellants argue, that the definition of "medically necessity" in the contract is the same whether applied to the HMO or the PPO coverage. Thus, the "fraudulent misrepresentation" alleged here is not a classic misrepresentation of a present fact. Rather, the assertion is that the appellees did not perform the contract in accordance with its terms.

 The question then initially arises whether the breach of a contractual promise can ever be the subject of the tort of fraudulent misrepresentation. We have held that it can. A promise or contractual commitment may be actionable as fraud (misrepresentation) if at the time of its making, the promisor had no present intention of carrying it out. *Bennett, supra,* 377 A.2d at 60–61; *see also Day v. Avery,* 179 U.S.App. D.C. 63, 71 n. 39, 548 F.2d 1018, 1026 n. 39 (1976); PROSSER & KEATON ON TORTS § 109, at 763 (5th ed.1984). "A promissory representation, or a representation as to future events asserted in a common law fraud action, should only be considered a misrepresentation of fact where the evidence shows that the promise was made without the intent to perform, or that the promisor had knowledge that the events would not occur. When a person positively states that something is to be done or is to occur, when he knows the contrary to be true, the statement will support an action in fraud." *Bennett, supra,* 377 A.2d at 60–61 (citations omitted). Prosser expands further on the requirement of a present intent not to perform when entering a contract to support a later action for fraud:

> Unless the present state of mind is misstated, there is of course no misrepresentation. When a promise is made in good faith, with the expectation of carrying it out, the fact that it subsequently is broken gives rise to no cause of action, either for deceit, or for equitable relief. Otherwise any breach of contract would call for such a remedy. The mere breach of a promise is never enough in itself to establish the fraudulent intent. It may, however, be inferred from the circumstances, such as the defendant's

---

**10.** There is no complete copy of the group contract in the record on appeal. There is one excerpt from the contract that includes the above referenced definition of medical necessity.

insolvency or other reason to know that he cannot pay, or his repudiation of the promise soon after it is made, with no intervening change in the situation, or his failure even to attempt any performance, or his continued assurances after it is clear that he will not do so.

§ 109 at 764–65 (footnotes omitted).

█ We turn to the issue whether, in opposing the motion for summary judgment, appellants presented "clear and convincing evidence," viewing the evidence as we must in the light most favorable to appellants, to establish a prima facie case that, at the time the appellees made the representations in the contract as to HMO coverage, they did so without any intent to perform it in accordance with its terms.

The first step to this inquiry is whether the contract was in fact breached at all, a matter as to which the parties settled out of court. The record does not show that the appellees ever in so many words denied Araya coverage of more than five sessions under the HMO before he switched to the PPO coverage.[11] Rather, the claim is, he was "forced" to switch. It is broadly asserted that HMS' case managers, who were not licensed psychologists, acted as gatekeepers for the HMO mental health benefits and were instructed to limit a subscriber's HMO sessions by informing mental health patients after their approved target of 6 to 10 sessions that they would be denied all insurance coverage (whether under the HMO, PPO, or indemnity component of the Capital Choice plan) for mental health treatment on the grounds that the treatment was not "medically necessary" unless they switched to the more expensive PPO or indemnity coverage. In this way, it is claimed, "medical necessity" determinations were applied inconsistently and coercively across product lines for the

purpose of extorting extra payments from mental health patients.

Appellees deny that any such limitation of HMO coverage was ever effectuated explicitly or by coercion. Appellees asserted that Dr. Gualtieri was to submit an outpatient treatment report requesting approval for additional HMO sessions after Araya completed the sessions that ended on February 6, 1998. HMS received a request from Dr. Gualtieri for additional HMO covered sessions on March 2, 1998. Six additional HMO sessions were approved, and more sessions could have been requested after that point, but the appellants had switched to the PPO. No appeal was ever taken from the approval of only the six additional sessions.

The question then becomes precisely what evidence was proffered by appellants to support their assertions of coercion to switch to the PPO coverage pursuant to an undisclosed policy to limit HMO coverage. Essentially, as best we can tell from the record before us as guided by appellants' brief, only two items in the record directly bear on this assertion. The first is the deposition testimony of Burdetsky in which she testified that she was told by an HMS representative "if we used the PPO portion, that we would not have to go through any of the preapproval," and thus the representative "recommended" that Burdetsky and Araya switch Araya's mental health treatment to the PPO coverage. The second is the affidavit of Dr. Gualtieri that he "had previously been told by defendants that it was advisable to switch patients to PPO or indemnity plans to avoid an outright denial by the HMO case managers because a denial by an HMO case manager could result in a denial of

11. Appellants do assert that Araya was denied coverage at the frequency, twice per week, that Dr. Gualtieri recommended in January 1998.

coverage for the treatment, regardless of the coverage plan being utilized."

Appellants also cite to a letter written by Araya to Blue Cross in April 1998 wherein Araya states that he "elected" to use his PPO coverage because he "was not allowed to access the necessary and recommended mental health care services under the HMO option" and that he was dissatisfied with HMS, but this is not further explained or expounded. Apart from evidence specific to Araya, appellants also point to certain evidence relating to providers indicating HMS' expectations of necessary treatment. For example, an HMS policy document indicates that the standard for treatment under a brief-focused therapy model is 12 or fewer sessions, and an HMO provider manual authorizes 6 to 10 sessions after which the provider has to call HMO two weeks prior for more sessions. But no document shows any flat limit contrary to the plan's terms.

This scattered evidence, even when viewed in the light most favorable to appellants, does not constitute clear and convincing evidence that any breach of contract even occurred, much less that the appellees entered into a contract with Burdetsky and Araya with a subjective intent to breach.[12] Based on the documents cited by appellants and the arguments made by them in support of their fraud claim, "[n]othing in the record establishes or suggests that the [ ] representation[s] w[ere] made without the intention to perform or with the intention to mislead or deceive ... [and a] mere allegation in an unveri-

fied complaint is not enough." *Bennett, supra,* 377 A.2d at 61 (citation omitted). Under the contract, it was indeed true that if mental health treatment of a consumer was found to be not "medically necessary" under the HMO, that determination would also apply to treatments under the PPO. HMO determinations needed to be made in advance and were precertified by HMS in groups of 6–10 sessions. Apparently no such prior approval was required under PPO. In short, appellants have failed to provide the clear and convincing evidence to establish a prima facie case that appellees had planned, upon entering into the contract, to deny coverage under the HMO contrary to the contractual representations and then in fact did so. Appellants simply have not pointed to sufficient evidence in the record to meet, under the requisite standard of proof, their burden of "produc[ing] at least enough evidence to make out a prima facie case in support of [their] position." *Joeckel, supra,* 793 A.2d at 1281–82.

## B.

◼ As to the alleged misrepresentation about the large provider panel, appellants cite to the provider directory that Burdetsky and Araya were given when they were considering enrolling in Capital Choice.[13] Appellants argue that this list of providers was a misrepresentation because appellees knew that the impending rate cut, of which Burdetsky was not informed, would lead to providers leaving the panel.

Appellees argue that there was no misrepresentation as to the size of the provid-

---

12. The issue, of course, is not whether the evidence is clear and convincing to the court but rather whether a reasonable fact finder could find the evidence sufficient to be clear and convincing proof of fraud. *See Anderson, supra,* 477 U.S. at 249–50, 106 S.Ct. 2505. We apply that standard to our analysis.

13. Appellants also mention claims that were made to Burdetsky at an employee orientation, but do not cite any specific language that was used by the insurance company at the orientation that led Burdetsky to believe that the provider panel was a certain size.

er panel because "the benefits book does not obligate Blue Cross to provide any particular panel or any particular size panel. It does not obligate Blue Cross to ensure that the panel would never change."[14] Appellants point to no evidence indicating that promises were made to Burdetsky and Araya indicating how many providers would be on the HMO panel or how long those providers would be included.

In substance, appellants' argument is that by setting forth the names of specific providers that were included in the plan at the time of Burdetsky's enrollment, there was an implied promise that this list would remain substantially unchanged for the duration of the enrollment period. While it is possible to conceive of circumstances where the composition of the provider list would so markedly change that a breach of contract could fairly be inferred, it is difficult from this record to perceive that such a change in fact occurred, much less that such a change was shown by clear and convincing evidence. Nor do we think in the precise circumstances here, however it might apply in other contexts, that the appellees' awareness of the possibility of adverse impact could reasonably be found to have mandated disclosure of that infor-

mation to Burdetsky in particular so as to be deemed to have engaged in fraudulent misrepresentation.[15] Furthermore, appellants have pointed to no evidence in the record, and we have found none, to demonstrate that appellees, at the time of entering into the Capital Choice contract with appellants intended to breach the contract by not having a sufficient mental health provider panel, *Bennett, supra*, 377 A.2d at 61, even if they were aware of anticipated possible difficulties.

### C.

■ A further requirement for fraud is that action be taken in reliance upon the misrepresentation. *Atraqchi, supra*, 788 A.2d at 563. In its order granting summary judgment, the trial court concluded that the appellants had not demonstrated reliance upon the alleged misrepresentations. The parties agree that the trial court misconstrued Burdetsky's deposition testimony that she had only one choice of health insurance plans.[16] Moreover, even if the Kaiser plan was not a viable option for Burdetsky and Araya, the element of reliance is satisfied if a consumer is persuaded by a misrepresentation to buy a product, even if it is the sole product under

---

14. Indeed, the provider directory itself contains a disclaimer in bold faced type that states: "This directory reflects all active participating providers as of October 1997. Participating providers may change."

15. Appellants point to evidence that HMS was seriously concerned, prior to implementation, that the rate cut could have a marked negative consequence on the provider panel. An HMS Vice President stated during her deposition: "We knew it was going to be a shock for providers. We knew that we were going to have a lot of clean-up work to do. And it was something we had never done before." But, as previously indicated, the record before us indicates that only some 100 participants left from a panel of 1000. Even if a ten percent

reduction could be deemed a breach of an implied contractual representation, it is difficult to see how such a relatively small change in the panel composition could meet the demanding requirements for fraud. See also Part C, *infra*.

16. Burdetsky had a choice between Kaiser and Capital Choice when she chose Capital Choice in the fall of 1997. Her deposition testimony cited by the trial court, where she indicated that "she never considered the only other insurance option offered ... because it was restricted to Maryland residents," was actually with regard to her insurance situation with a prior employer in 1994. In the fall of 1997, Kaiser did offer a plan for Virginia residents.

consideration by the consumer. *See, e.g., Mills v. Cosmopolitan Ins. Agency, Inc.,* 424 A.2d 43 (D.C.1980) (reversing directed verdict for defendant insurance company where appellant made out a prima facie case for fraud where no evidence was presented that appellant was choosing between different policies when purchasing a policy from appellee).

Since appellants' claims already founder for the reasons set forth above, the issue of evidence of reliance is not dispositive of this appeal. Nonetheless, we observe that the evidence of reliance on the alleged misrepresentation in deciding on the Capital Choice plan fell short of clear and convincing, notably with respect to the size of the provider panel. To be sure, "[t]he maker of a fraudulent misrepresentation is subject to liability for pecuniary loss suffered by one who justifiably relies upon the truth of the matter misrepresented, if his reliance is a substantial factor in determining the course of conduct that results in his loss." RESTATEMENT (SECOND) OF TORTS § 546 (1977). "It is not ... necessary that [a plaintiff's] reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor in influencing his conduct ... It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision." *City Solutions Inc. v. Clear Channel Communications, Inc.,* 365 F.3d 835, 840 (9th Cir.2004) (alterations in original) (citations omitted).

Here, however, as the trial court noted, Araya was already in treatment with a doctor who was a provider under the chosen Capital Choice plan. Burdetsky testified at her deposition simply that she believed, based on the benefits booklet, that 52 HMO sessions for mental health treatment was a "benefit you could access" under the Capital Choice plan and that she was not aware of any restrictions on that benefit when she signed up for the plan. True, in a later affidavit, Burdetsky stated, "I was pleased that the Arlington County plan stated that [Araya] was able to obtain 52 sessions every year, this benefit was substantially more generous than the plan at my previous employer. I relied on that statement in choosing my health care coverage." But as to whether the benefit was a "substantial factor" in the decision to enroll, she indicated in her deposition that she did not give "too much" consideration to an alternative health care plan "because we had our doctors and he had his counseling" under the Capital Choice plan.[17] Furthermore, Burdetsky outlined the clear deficiencies in the alternate choice of Kaiser Permanente. See note 4 *supra.* There is no explanation why she would have chosen to forego any health insurance coverage even if she had known that the HMO coverage would effectively be limited to 6 to 10 sessions; she certainly gave no intimation of such a point of view.

As to the alleged misrepresentation about the size and stability of the provider panel, there is no indication that the large provider list was a "substantial factor" in

---

**17.** Burdetsky indicated that she was not aware that HMO services were subject to managed care approval although the benefit booklet specifically indicated that outpatient mental health treatment is "subject to Utilization Management Program provisions" and elsewhere explained the process for accessing HMO benefits. As appellee asserts, the fact that appellants erroneously believed that the statement "up to" 52 sessions meant that there was an entitlement to 52 sessions independent of managed care restrictions is not fraud. *See Schiff v. AARP,* 697 A.2d 1193, 1198 (D.C.1997) (a person's good faith belief does not create a cause of action unless the other party makes a false representation that leads to that belief).

appellants' decision making, except for the inclusion on that list of one name—Dr. Gualtieri. There is nothing in the record to indicate that the overall composition of the panel played a substantial part in the decision to subscribe to Capital Choice. In sum, appellants have not shown a "genuine issue as to any material fact," *Futrell v. Dep't. of Labor Fed. Credit Union,* 816 A.2d 793, 802 (D.C.2003), that would demonstrate the subscribers' substantial reliance on the alleged misrepresentations by clear and convincing evidence. *See Atraqchi, supra,* 788 A.2d at 563.

### III. Amendment of Complaint

■■■ Appellants argue that the trial court erroneously denied their May 2001 motion to amend[18] their complaint to include statutory grounds for fraud under the CPPA. The proposed amendment included two claims under the CPPA[19]: a direct claim of fraud based on the statements made to Burdetsky and Araya and a representative claim made on behalf of the general public.[20] A motion to amend should be liberally granted. *Pannell v. Dist. of Columbia,* 829 A.2d 474, 477 (D.C. 2003) (noting that there is a "virtual presumption" in favor of granting a motion to amend "unless there are sound reasons for denying it"). "The lateness of a motion for leave to amend, however, may justify its denial if the moving party fails to state satisfactory reasons for the tardy filing and if the granting of the motion would require new or additional discovery." *Id.* (citation omitted). We review denial of a motion to amend for abuse of discretion. *Id.; see also Sherman v. Adoption Ctr. of Washington,* 741 A.2d 1031, 1037 (D.C. 1999) (trial court has "wide discretion" in ruling on a motion to amend).

■■■ The trial court denied the motion for undue delay that was "not satisfactorily explained" and prejudice to the appellees. The trial court noted that the motion to amend the complaint to add the CPPA claims was made two weeks before the scheduled pretrial conference, seven months after the close of discovery, and more than two years after the December 10, 1998 filing of the initial complaint. *See, e.g., Gaetan v. Weber,* 729 A.2d 895, 898–99 (D.C.1999) (affirming denial of leave to amend that also sought to admit forty newly identified documents into evidence filed one month pretrial after joint pretrial statement had already been filed). The trial court specifically noted in its order that summary judgment had already been

18. In their brief, appellants also characterize the motion as one to "clarify" that they were seeking relief under the statute as well as for common law fraud. Appellants argue that later specification of a statutory theory of recovery that is parallel to an existing common law theory is permitted pretrial without formal amendment of a complaint. However, the case appellants cite in support of this argument, *May Dep't Stores Co. v. Devercelli,* 314 A.2d 767 (D.C.1973), actually did involve formal amendment of a complaint to include a statutory claim for slander in addition to the common law claim already pled, *id.* at 773, and we have found no other basis to treat appellants' motion as anything other than a motion to amend the complaint.

19. The proposed amended complaint also included changes to the basis for the common law fraud complaint, asserting that appellees had misled the "general public" as well as Burdetsky and Araya about the scope of HMO benefits under the Capital Choice plan. The trial court denied all of the May 2001 proposed amendments to the complaint. Appellants only raise the issue of denial of the CPPA claims on appeal.

20. A consumer may file a complaint under the CPPA in Superior Court in the first instance and is not required to exhaust administrative remedies with the Office of Consumer Protection. D.C.Code § 28–3905(k)(1) (2001); *see also Baker v. District of Columbia,* 494 A.2d 1299, 1302 n. 5 (D.C.1985).

briefed at the time of appellants' motion. In its order, the trial court recognized that the representative claim under the CPPA could not have been filed any sooner than October 2000, when the statute was amended to allow such representative claims, and thus there was only a delay of seven months as to that claim. The trial court nevertheless concluded that the delay had not been satisfactorily explained.

Appellants argue here, as they did to the trial court, that no new facts were pled, only a new legal theory, such that concerns about lengthening discovery were not relevant to their motion. The CPPA states that a trade practice can be unlawful "whether or not any consumer is in fact misled, deceived or damaged thereby." D.C.Code § 28–3904 (2001). Appellants cite this statutory language to argue that because no proof of reliance is necessary, no further discovery as to individual damages and mitigation had to be undertaken by appellees to litigate the statutory fraud claim. While further discovery may not have been necessary as to Burdetsky and Araya,[21] the motion to amend specifically sought to include a representative CPPA claim made "on behalf of the general public."

In order to pursue a claim on behalf of the "general public," appellants would have to point to misleading, fraudulent statements made to individuals other than Burdetsky and Araya. The proposed amendment refers to fraudulent representations "[i]n the context of marketing and supplying the Capital Care insurance products in the Washington metropolitan area in or around the fall of 1997 and thereafter." To prove this claim, appellants would have to produce evidence of materials or statements made to consumer groups in the Washington metropolitan area during that time period. This would go beyond the scope of discovery that had already been completed, which dealt only with the materials provided to Burdetsky as an employee of Arlington County government. Such an additional claim would clearly require further discovery. Appellees point to evidence in the record that the Arlington County government, as an employer, had the authority to give prior written approval of all insurance materials distributed to or shown to its employees as evidence that explanatory materials about the HMO component of the Capital Choice plan are not identical depending on the audience, i.e., employees of different employers may receive different materials. Appellees also assert that addition of the representative CPPA claim would require taking depositions from contracting officials and marketing representatives at various employer groups that contracted with Capital Choice to discover what representations were made to them by the appellees. *See Pannell, supra,* 829 A.2d at 477–78 (affirming denial of leave to amend where there had been no discovery on the new claim and motion was filed two years after original complaint).

Appellants also argue that the representative claim under the CPPA for injunctive and declaratory relief could not have been filed any sooner than October 2000, when the statute was amended to allow such representative claims.[22] The trial court

---

21. As to a direct claim for fraud under the CPPA by Burdetsky and Araya, even if additional discovery was not necessary, appellees would still have been required to file an answer to the new complaint, amend their pre-trial statement, and be given the opportunity to file dispositive motions with respect to a claim under the CPPA that appellants offer no explanation for their failure to file during a period of two and a half years of ongoing litigation.

22. Appellants also seek to excuse further delay after the statute was amended by citing its publication date of March 2001.

found that appellants had not satisfactorily explained the delay in waiting seven months after the statute was amended to file their motion. Furthermore, as indicated previously, the representative claim would require extensive additional discovery.

Appellees further assert that, even assuming the CPPA claims were timely filed by appellants, the trial court's denial of the motion to amend can be affirmed on the grounds that the proposed claims were futile. Burdetsky and Araya's direct action, as well as the representative action under the CPPA, would have failed for the same reason that summary judgment on the common law fraud claim is affirmed on appeal, because appellants have not met the burden of demonstrating by clear and convincing evidence fraudulent misrepresentation by appellees.[23] *See Osbourne v. Capital City Mortgage Corp.*, 727 A.2d 322, 325 (D.C.1999) (proof of an intentional misrepresentation under the CPPA must be made by clear and convincing evidence).

Furthermore, as appellants stated to the trial court in their motion to amend, there was no barrier to filing a new lawsuit seeking injunctive relief under the CPPA on behalf of the general public if, as appellants allege, the conduct of appellees is ongoing.[24] *See Johnson v. Capital City Mortgage Corp.*, 723 A.2d 852, 858 (D.C. 1999) ("[N]o practical difference appears to exist between the two possible procedural steps of permitting an amended or supplemental complaint in the original action or the filing of an independent action. The issue is purely one of form, and we think the trial court would have been within its discretion in choosing to allow either course of action.").

In sum, the trial court did not abuse its "wide discretion," *Sherman, supra,* 741 A.2d at 1037, in denying the motion to amend where the trial court relied on lengthy delay, the addition of significant additional discovery time, and the completion of summary judgment briefing prior to filing of the motion to amend.

For all the foregoing reasons, the judgment and orders of the trial court appealed from are hereby

*Affirmed.*

**23.** Appellants have strenuously contended that no further discover would be necessary to litigate this representative CPPA claim. Based on that assertion, the lack of evidence found in the common law fraud claim would apply equally to the representative action and Burdetsky and Araya's direct action.

**24.** Appellants stated in the motion to amend that they "would contemplate bringing a separate action seeking injunctive relief in the event that amendment is not permitted."